UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

MARIA TERESA HERNANDEZ,

Plaintiff,

v.

KILOLO KIJAKAZI, acting
Commissioner of Social Security,

Defendant.

No. 1:21-cv-00036-CDB

**ORDER DIRECTING ENTRY OF
JUDGMENT IN FAVOR OF PLAINTIFF
AND AGAINST DEFENDANT
COMMISSIONER OF SOCIAL SECURITY**

(Doc. 15)

I.      **Introduction**

Plaintiff Maria Teresa Hernandez ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for supplemental security income pursuant to Title XVI of the Social Security Act.  The matter is before the Court on the parties' briefs which were submitted without oral argument to the United States Magistrate Judge.[1]  Docs. 15, 22.  After reviewing the record the Court finds that substantial evidence and applicable law do not support the ALJ's decision.  Plaintiff's appeal is therefore granted.

---

[1] The parties consented to the jurisdiction of a United States Magistrate Judge.  *See* Docs. 7 and 9.

1  **II.**  <u>**Factual and Procedural Background**</u>[2]

2    On December 27, 2017 Plaintiff applied for supplemental security income alleging

3 disability as of January 12, 2017.  AR 276–84.  The Commissioner denied the application initially

4 on July 11, 2018 and on reconsideration on October 16, 2018.  AR 200–04.  Plaintiff requested a

5 hearing which was held before an Administrative Law Judge (the "ALJ") on April 7, 2020.  AR

6 35–72.  On May 6, 2020 the ALJ issued a decision denying Plaintiff's application.  AR 12–34.  The

7 Appeals Council denied review on November 9, 2020.  AR 1–6.  On January 11, 2021, Plaintiff

8 filed a complaint in this Court.  Doc. 1.

9  **III.**  <u>**The Disability Standard**</u>

10    Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the

11 Commissioner denying a claimant disability benefits.  "This court may set aside the

12 Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal

13 error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180

14 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the

15 record that could lead a reasonable mind to accept a conclusion regarding disability status.  *See*

16 *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less than a

17 preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted),

18 *cert den'd*, 519 U.S. 1113 (1997).     When performing this analysis, the court must "consider the

19 entire record as a whole and may not affirm simply by isolating a specific quantum of supporting

20 evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and

21 quotations omitted).  If the evidence could reasonably support two conclusions, the court "may not

22 substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v.*

23 *Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an

24 ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error

25 was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d

26

27    [2] The Court has reviewed the relevant portions of the administrative record including the
medical, opinion and testimonial evidence about which the parties are well informed, which will

28 not be exhaustively summarized.  Relevant portions will be referenced in the course of the
analysis below when relevant to the parties' arguments.

1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§ 416.920(a)-(f).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled.  20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level.  20 C.F.R. § 416.920(a)-(f).  While the Plaintiff bears the burden of proof at steps one through four, the burden shifts to the commissioner at step five to prove that Plaintiff can perform other work in the national economy given her RFC, age, education and work experience.  *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).

## IV.    The ALJ's Decision

At step one the ALJ found that Plaintiff had not engaged in substantial gainful activity since her application date of December 27, 2017.  AR 18.  At step two the ALJ found that Plaintiff had the following severe impairments: right shoulder superior labral anterior posterior (SLAP) with chondroplasty and acromioplasty; borderline intellectual functioning; generalized anxiety disorder;

major depressive disorder; and osteoarthritis in the bilateral hands.  AR 18.  The ALJ also found at step two that Plaintiff had the following non-severe impairments: obesity; diabetes mellitus with neuropathy; trigger finger; and plantar fasciitis with heel spurs.  AR 19.  At step three the ALJ found that Plaintiff did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 19.

Prior to step four the ALJ evaluated Plaintiff's residual functional capacity (RFC) and concluded that Plaintiff had the RFC to perform medium work as defined in 20 C.F.R. 416.967(b) with postural restrictions not at issue; occasional overhead reaching with the right dominant upper extremity; frequently handling and fingering with the bilateral upper extremities; no exposure to hazards such as unprotected heights and heavy mechanical machinery; little to no exercise of judgment; simple duties that can be learned on the job in under 30 days with a reasoning level of no higher than two; can sustain ordinary routines, understand, carry out and remember simple instructions and use judgment in making simple work related decisions; can attend and concentrate for two hour periods totaling a normal eight hour workday with usual work breaks; can respond appropriately to supervision, co-workers and usual work situations and tolerate occasional interaction with the general public. She can deal with changes in a routine work setting.  AR 21–28.

At step four the ALJ concluded that Plaintiff had no past relevant work.  AR 28.  At step five, in reliance on the VE's testimony, the ALJ concluded that Plaintiff could perform other jobs existing in significant numbers in the national economy, namely: counter supply worker, cleaner, and church cleaner.  AR 29.  Accordingly, the ALJ concluded that Plaintiff was not disabled at any time since her application date of December 27, 2017.  AR 29.

## V.    Issues Presented

Plaintiff asserts four claims of error: 1) that the ALJ failed to identify an apparent conflict between the DOT and the VE's testimony; 2) that the ALJ erred in finding diabetic neuropathy and plantar fasciitis non-severe and omitting corresponding limitations from the RFC; 3) that the ALJ erred in rejecting the opinions of her treating physicians, Drs. Sharma and Abordo; and 4) that the

1  ALJ erred in rejecting the opinion of the treating psychologist, Dr. Mouanoutoua.  Br. at 8, Doc.

2  15.

3                     **A.      Consistency between DOT and VE's Testimony**

4                               **1.      Applicable Law**

5       Pursuant to SSR 00-4p:

6       Occupational evidence provided by a VE or VS generally should be consistent with
        the occupational information supplied by the DOT. When there is an apparent
7       unresolved conflict between VE or VS evidence and the DOT, the adjudicator must
        elicit a reasonable explanation for the conflict before relying on the VE or VS
8       evidence to support a determination or decision about whether the claimant is
        disabled. At the hearings level, as part of the adjudicator's duty to fully develop the
9       record, the adjudicator will inquire, on the record, as to whether or not there is such
10      consistency.

11      Neither the DOT nor the VE or VS evidence automatically "trumps" when there is
12      a conflict. The adjudicator must resolve the conflict by determining if the
        explanation given by the VE or VS is reasonable and provides a basis for relying on
13      the VE or VS testimony rather than on the DOT information.

14                               **2.      Analysis**

15          Here, the ALJ limited Plaintiff to occasional overhead reaching with her right (dominant)

16  upper extremity in consideration of her shoulder impairment.  AR 21.  The ALJ also posed this

17  limitation to the VE in a hypothetical at the hearing, and the VE identified three jobs an individual

18  with such a limitation could perform, namely: counter supply worker, cleaner, and church cleaner.

19  AR 66–68.  Plaintiff contends that this conflicts with the DOT in that all three jobs require frequent

20  reaching, though the DOT's reaching limitations are generic and do not specify the direction of the

21  reaching in question.  Accordingly, Plaintiff contends the ALJ should have inquired further of the

22  VE and sought a reasonable explanation for the conflict.

23          The Ninth Circuit addressed this issue in *Gutierrez*, in which the VE testified an individual

24  with above-shoulder reaching limitations could perform the job requirements of cashier, which

25  required frequent reaching according to the DOT.  *Gutierrez v. Colvin*, 844 F.3d 804, 807–08 (9th

26  Cir. 2016).  The court noted that not all jobs requiring frequent reaching necessarily require

27  reaching overhead, and that in the case of a cashier it was unlikely and unforeseeable that it would

28  require reaching overhead.  *Id.*  Accordingly, the court found no apparent conflict between the VE's

                                              5

testimony and the DOT.

Plaintiff argues that *Gutierrez* is distinguishable because, unlike the cashier jobs at issue in *Gutierrez*, the requirement of overhead reaching is a "'common and obvious' part the jobs of Counter Supply Worker, 319.687-010, Cleaner, 323.687-010; and Church Cleaner, 389.667-010."

The Court respectfully disagrees.  The DOT descriptions are as follows:

Counter Supply Worker:
Replenishes food and equipment at steamtables and serving counters of cafeteria to facilitate service to patrons: Carries food, dishes, trays, and silverware from kitchen and supply departments to serving counters. Garnishes foods and positions them on table to ensure their visibility to patrons and convenience in serving. Keeps assigned area and equipment free of spilled foods. *Keeps shelves of vending* machines stocked with food when working in automat. DOT 319.687-010, 1991 WL 672772 (emphasis added).

Cleaner:
Cleans hospital patient rooms, baths, laboratories, offices, halls, and other areas: Washes beds and mattresses, and remakes beds after dismissal of patients. Keeps utility and storage rooms in clean and orderly condition. Distributes laundered articles and linens. *Replaces soiled drapes and cubicle curtains*. Performs other duties as described under CLEANER (any industry) I Master Title. May disinfect and sterilize equipment and supplies, using germicides and sterilizing equipment. DOT 323.687-010, 1991 WL 672782 (emphasis added).

Church cleaner:
Takes care of church buildings and furnishings: Performs cleaning and routine maintenance duties in church and auxiliary buildings and in churchyard, or gives directions to other workers so engaged. Takes care of vestments and sacred vessels and prepares altar for religious services according to prescribed rite. Opens and locks church before and after services. Rings bells to announce services and other church events. Tends furnace and boiler to provide heat. May order cleaning supplies. May act as usher during services, maintain attendance count, and conduct visitors between services. May take part in conduct of services performing activities, such as lighting candles. May maintain church cemetery. May patrol church premises to provide security against vandalism and theft. DOT 389.667-010, 1991 WL 673278.

As Plaintiff emphasizes, a number of these duties may require some overhead reaching, including restocking shelves and replacing soiled drapes and curtains.  But it is not apparent that overhead reaching is required.  Moreover, it highly unlikely that these jobs require overhead reaching on more than an occasional basis (1/3 of an 8-hour day).  Most of the tasks described would naturally be carried out at eye level or below.  Thus, there was no apparent conflict for the

ALJ to explore with the VE.

Considering the DOT does not specify reaching direction, it would perhaps be good practice and not overly burdensome for the ALJ to quickly obtain clarification from the VE as to the direction of reaching involved in the identified jobs.  Nevertheless, failure to do so is not erroneous absent an apparent conflict between the DOT job descriptions and the VE's testimony that a hypothetical individual with a given set of limitations (including no more than occasional overhead reaching) could perform such jobs.

## B.     Step Two Non-Severity Finding

### 1.     Applicable Law

At step two of the five-step process, plaintiff has the burden to provide evidence of a medically determinable physical or mental impairment that is severe and that has lasted or can be expected to last for a continuous period of at least twelve months.  *Ukolov v. Barnhart*, 420 F.3d 1002, 1004–05 (9th Cir. 2005) (*citing* 42 U.S.C. § 423(d)(1)(A)).   A medically determinable physical or mental impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques," and will not be found based solely on the claimant's statement of symptoms, a diagnosis or a medical opinion. 20 C.F.R. § 404.1521.

Step two is "a de minimis screening device [used] to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). A "severe" impairment or combination of impairments is one that significantly limits physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520.  An impairment or combination of impairments should be found to be "non-severe" only when the evidence establishes merely a slight abnormality that has no more than a minimal effect on an individual's physical or mental ability to do basic work activities.  *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005); 20 C.F.R. §§ 404.1522, 416.922. "Basic work activities" mean the abilities and aptitudes necessary to do most jobs, including physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling, and mental functions such as the ability to understand, carry out, and remember simple instructions, deal with changes in a routine work setting, use judgment, and respond appropriately to supervisors,

coworkers, and usual work situations. 20 C.F.R. § 404.1522, 416.922.

When reviewing an ALJ's findings at step two the Court "must determine whether the ALJ had substantial evidence to find that the medical evidence clearly established that [the claimant] did not have a medically severe impairment or combination of impairments." *Webb*, 433 F.3d at 687 (citing *Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988) ("Despite the deference usually accorded to the Secretary's application of regulations, numerous appellate courts have imposed a narrow construction upon the severity regulation applied here.")).

### 2.    Analysis

The ALJ found Plaintiff's diabetic neuropathy and plantar fasciitis non-severe.   In so concluding, the ALJ explained as follows:

> Regarding diabetes mellitus with neuropathy, the record shows in January 2017 the claimant was not on medication for diabetes mellitus (B4F/6). In February 2017, the claimant was prescribed Glipizide (B4F/11). Her average blood sugar readings were in the 300s (B4F/12). In June 2017, the record indicates that the claimant did not take her medication as prescribed for over one month while she was out of town (B4F/43, 111). The record shows A1c results of 12.2, 11.5, 12.0 and 12.8 in May 2017, September 2017, January 2019 and October 2019, respectively (B4F/136, 137, B16F/143, B24F/39). Although the record indicates that the claimant exhibited diminished sensation on the right foot from the toes to the arch, she had no antalgic gait (B4F/113). She was treated with gabapentin (B4F/93). The claimant testified that she takes her medication as prescribed and that she tests her blood sugar level twice a day.
> . . .
>
> The record also shows that the claimant has plantar fasciitis with heel spurs (B4F/114). She exhibited plantar fibroma on the mid substance of the plantar fascia ligament as well as tenderness to palpation at the plantar aspect of the heel bilaterally (B4F/113, 123). She was prescribed a night splint and told not to be barefoot or wear flat shoes (B4F/114). The claimant reported that she did not use the night splints as much, due to her shoulder surgery (B4F/121). A November 2017 radiograph of the right foot shows prominent plantar calcaneal spur showing mild progression since the previous study and a flattening of the plantar arch (B4F/130).  November 2017 radiograph of the left foot shows interval progression of a plantar calcaneal spur and other chronic and degenerative changes (B4F/133). At the internal medicine consultative examination, the claimant stated that she had some pain in the arch and the ankles and that fitted shoes from her podiatrist help significantly with arch support (B9F/3). Additionally, the claimant reported walking her dog on a daily basis. During a September 2019 consultative examination, her gait was normal and again she reported that inserts her feet (B17F). She also reported walking her dog five times a day (B24F/46). The following month she reported that she went to the

1   mall with her nieces. The evidence of record demonstrates that the claimant's plantar
2   fasciitis with heel spurs did not impose more than minimal limitations on the
    claimant's ability to function and are therefore non-severe impairments

3   Plaintiff emphasizes the following evidence of record concerning her feet impairments …

4   To the contrary, Plaintiff argues (Br. 29031), these findings support the severity thereof:  reports of

5   burning, tingling, numbness and walking difficulties; exam noting erythematous, dry, thick, scaly

6   skin; Glipizide prescription for uncontrolled type II diabetes mellitus; bilateral plantar fibroma;

7   diminished sensations; heel tenderness; bowstringing of the plantar fascia on hallux dorsiflexion;

8   foot pain and difficulties walking due to peripheral neuropathy; progressive plantar calcaneal spurs;

9   flattening of the plantar arch; degenerative change of the interphalangeal joints of the toes;

10  prescription for shoe inserts, night splints, and gabapentin.  AR 494, 515, 525, 532, 730, 733, 903,

11  906, 907, 935, 1117, 1122.  Plaintiff also testified she suffers foot numbness left worse than right,

12  neuropathic pain right worse than left (though it had improved), she does shop with her children

13  and pushes the cart (for an unspecified length of time), can walk about 1 block (the length she walks

14  her dog), can stand thirty minutes to an hour to wait for a bus.  AR 55–56, 60–61.

15  As quoted above, the ALJ did acknowledge much of this evidence.  But a recitation of

16  objective findings alone is insufficient, and the discussion otherwise revealed little by way of

17  analysis as to why the ALJ concluded the impairments were non-severe.

18  First, the ALJ noted Plaintiff was not on diabetes medication as of January 2017.  AR 18.

19  But the following month she was.  AR 18.  The significance of the prescription timing is not clear.

20  Her average blood sugar readings were in the 300s, which does not suggest non-severity.  While

21  fasted and unfasted levels above 126 and 200mg/dl (respectively) indicates diabetes,[3] two

22  consecutive readings above 300mg/dl in a diabetic is considered a dangerous situation warranting

23  a call to the patient's doctor.[4]  Her A1C levels were similarly high (consistently at or above 12%)

24  which is far in excess of the normal threshold (below 5.7%), the prediabetic threshold (5.7% to

---

[3] https://www.mayoclinic.org/diseases-conditions/diabetes/diagnosis-treatment/drc-20371451.

[4] https://www.med.umich.edu/1libr/MEND/Diabetes-Hyperglycemia.pdf; *see also* https://my.clevelandclinic.org/health/diseases/16628-diabetic-coma.

1   6.4%), and the diabetic threshold (6.5%).[5]

2   Next, the ALJ notes that Plaintiff did not take her diabetes medication for one month in June

3   of 2017.  AR 18 (citing Ex. 4F/43, 111).  The relevant period did not begin until December 27,

4   2017, the date she filed her SSI claim.[6]  Although courts are not prohibited from considering records

5   outside the relevant period when evaluating an SSI claim,[7] a one-month period of medication non-

6   compliance prior to the relevant period is an insufficient basis upon which to rest a non-severity

7   finding.  There was no evidence of diabetes medication non-compliance during the 29-month

8   relevant period between the December 27, 2017 SSI application date and the May 6, 2020 ALJ

9   decision date.

10  Finally, the ALJ noted that Plaintiff had diminished sensation upon examination but no

11  antalgic gate.  The lack of an antalgic gate during a brief physical examination does not support an

12  inference that the impairment is non-severe, or that the claimant can stand and walk for the majority

13  of an 8-hour day as the ALJ found she could do by assessing an RFC for medium work without

14  standing or walking restrictions.  SSR 83-10.

15  As to Plaintiff's plantar fasciitis, the ALJ noted Plaintiff was prescribed a night splint and

16  supportive shoes.  AR 19.  The ALJ noted, as Defendant emphasizes, that Plaintiff reported she

17  "did not use the night splints as much, due to her shoulder surgery."  AR 19 (citing B4F/121).

18  "[U]nexplained, or inadequately explained, failure to seek treatment or follow a prescribed course

19  of treatment" can justify rejection of a claimant's pain testimony.  *Fair v. Bowen*, 885 F.2d 597,

20  603 (9th Cir. 1989).  Here, not wearing the splints "as much" is not necessarily a total failure to

21  follow a prescribed course of treatment.  It was also not unexplained.  The cited reason was "due

---

[5] https://www.cdc.gov/diabetes/managing/managing-blood-sugar/a1c.html.

[6] Unlike disability insurance benefits, supplemental security income benefits are not retroactive to the date of disability onset, but are payable from the date of the application.  20 C.F.R. §§ 416.335.  Accordingly, claimants must establish disability within the relevant period, namely from the date of the application through the date of the ALJ's decision.  *See Koster v. Comm'r of Soc. Sec.*, 643 F. App'x 466, 478 (6th Cir. 2016); *Parker v. Kijakazi*, No. 1:20-CV-00601-GSA, 2021 WL 5166004, at *4 (E.D. Cal. Nov. 5, 2021).

[7] *See Robert M. v. Saul*, No. CV 18-6380-KS, 2019 WL 8163478, at *3 (C.D. Cal. Dec. 9, 2019)

to her shoulder surgery." AR 19.  Although it is not clear why her shoulder surgery precluded her from wearing plantar fasciitis splints, the ALJ did not specifically take issue with Plaintiff's proffered explanation.  The ALJ simply recited a fact and reached a conclusion that the impairment was non-severe without providing a sufficient reason.

The ALJ also noted that Plaintiff reported to the consultative examiner that her fitted shoes from the podiatrist significantly helped with arch support.  AR 19.  This perhaps is most relevant to the x-ray showing flattening of the plantar arch, but does not self-evidently undermine the severity of her plantar fasciitis generally,[8] or related findings such as progressive calcaneal spurs or "other chronic or degenerative changes" as noted in the ALJ's description of the objective evidence.  Experiencing some relief in one aspect of her foot pain does not support the inference that the impairment was non-severe, or that she can stand and walk the majority of an 8-hour day without restriction.  Nor does the consultative examiner's finding that her gate was normal on one occasion during the consultative examination.

Finally, the ALJ noted that Plaintiff went to the mall with her nieces, and she also took her dog on five walks per day.  AR 19.  The mall trips were of unspecified frequency and duration, and she specified her dog walks were limited to about 1 block each and recommended by her physician to keep her blood sugar in check.  AR 52, 60.  "Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987).  That principle applies with even greater force here where the question is not whether her foot impairments were disabling, but whether they met the low threshold for severity at step two.  Unlike the meaning of the word "severe" in common speech,  a severe impairment in the social security context need not be disabling or debilitating, it need only be more than a slight abnormality with more than a minimal effect on work related functionality.  *Webb*, 433 F.3d at 686.  An impairment can meet that threshold without it precluding multiple 1 block dog walks per day and periodic trips to the mall of unspecified frequency and duration.

Relatedly, Plaintiff's treating physician and treating podiatrist, Drs. Sharma and Abordo,

---

[8] "Flat feet, a high arch or even an atypical pattern of walking can affect the way weight is distributed when you're standing and can put added stress on the plantar fascia." https://www.mayoclinic.org/diseases-conditions/plantar-fasciitis/symptoms-causes/syc-20354846

opined that Plaintiff was limited to a less than sedentary exertional capacity with less than 2 hours of standing and walking in an 8-hour day due in part to her diabetic neuropathy and plantar fasciitis, among other impairments.  AR 758; 1050.  Dr. Sharma's opinion and the ALJ's reasoning for rejecting the same is addressed in more detail below.  In short, the ALJ did not specifically take issue with the standing and walking restrictions identified by Dr. Sharma, nor did the ALJ's reasoning for rejecting Dr. Sharma's opinion have anything to do with Plaintiff's diabetic neuropathy or plantar fasciitis.

As to Dr. Abordo's opinion, the ALJ commented as follows:

> The undersigned finds this opinion unpersuasive. Although Dr. Abordo provided some explanation to support the opinion, the opinion is not consistent with the objective evidence from other sources. For instance, despite the claimant's heel spurs, plantar fasciitis and neuropathy she exhibited normal balance and gait at times (B16F/36, 57). Furthermore, she walks her dog daily (B4F/65, B24F/46). Moreover, his treatment note indicates that the claimant has equal muscle strength bilaterally, no tenderness, and no antalgic gait (B16F/53). Furthermore, the claimant reported significant benefit from orthotics (B9F).  AR 25–26.

The ALJ's reasoning was sufficient to refute Dr. Abordo's exaggerated opinion that Plaintiff was incapable of less than sedentary work with less than two hours of standing and walking in a workday.  For the same reasons discussed above, however, the reasoning (mostly duplicative of the ALJ's discussion at step two with the added factors of equal muscle strength and no tenderness) is not sufficient to find her plantar fasciitis non-severe, a finding entirely contradictory to Dr. Abordo's opinion.  There were numerous potential findings the ALJ could have made with respect to Plaintiff's foot impairments acknowledging the impact of those impairments on her ability to stand and walk throughout the workday, while not wholly embracing Dr. Abordo's opinion.  A supportable conclusion would lie somewhere in the middle, though the Court will not speculate as to what specific restriction would be appropriate and what the potential outcome might be on the available jobs at step five.[9]

As for his harmless error argument, Defendant contends:

---

[9] Because Plaintiff had no past relevant work to be considered at step four, the analysis on remand would proceed to step five.  AR 28.

1
2
3
4

As a threshold matter, because the ALJ continued the sequential analysis beyond step two, and considered all of Plaintiff's impairments in evaluating her claim of disability, including those that were not severe, any error was, at most, harmless. *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (holding that any error in not listing a condition as severe at step two was harmless because the ALJ considered the condition when assessing the claimant's limitations)

5

Resp. at 18, Doc. 22.

6   However, Defendant's reliance on *Lewis* is misplaced. Neither *Lewis* nor any other controlling

7   precedent has held, in so many words, that any step two errors are harmless so long as the case

8   proceeds past that step. Moreover, the holding in *Lewis* was predicated on the fact that,

9   notwithstanding any error with respect to the claimant's bursitis at step two, "[t]he ALJ extensively

10  discussed Lewis's bursitis at Step 4 of the analysis." *Lewis*, 498 F.3d at 911. The same cannot be

11  said here. At step four the ALJ discussed plantar fasciitis only in rejecting Dr. Abordo's opinion,

12  identifying the same reasons discussed above at step two (normal gate on exam, improvement with

13  orthotics, dog walking, etc.), that even collectively do not support a non-severity finding. The only

14  discussion of diabetes mellitus with neuropathy at step four was in restricting Plaintiff to frequent

15  bilateral handling and fingering and occasional hazard exposure due to dizziness caused by

16  diabetes, a discussion having little to do with foot impairments and associated standing and walking

17  restrictions. Indeed, the ALJ assessed no such restrictions.

18      On balance, the affirmative evidence supporting standing and walking limitations due to

19  diabetic neuropathy and plantar fasciitis was not overwhelming. It consisted of: 1) Plaintiff's

20  testimony that she can walk about 1 block (the length she walks her dog) and can stand thirty

21  minutes to an hour to wait for a bus (55–56, 60–61); 2) Drs. Sharma and Abordo's opinions

22  essentially to the same effect; 3) her reports to her treating physicians concerning her foot pain, and

23  4) positive x-ray and examination findings discussed above (sensory loss, calcaneal spurs, arch

24  flattening, and other degenerative changes).

25      Nevertheless, the evidence was sufficient to satisfy the low threshold for severity at step

26  two, and the ALJ's reasoning to the contrary is not persuasive. The error was harmful as the ALJ

27  did not offer any novel discussion at step four, nor did the ALJ include any standing and walking

28  restrictions in the RFC. Substantial evidence did not support the ALJ's conclusion that a 58-year

old obese individual with the Plaintiff's documented sensory and structural foot abnormalities could stand and walk without restriction for the majority of an 8 hour day, as required to perform medium work.  SSR 83-10.  Remand is appropriate for the ALJ to reconsider all related evidence, including appropriate restrictions in the RFC, and proceed through the sequential process as necessary.

### C.    The Treating Physicians' Opinions

#### 1.    Applicable Law

Before proceeding to step four, the ALJ must first determine the claimant's residual functional capacity.  *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018).  The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The RFC must consider all of the claimant's impairments, including those that are not severe.  20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner.  *See* 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC).  "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).  In doing so, the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995).

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 883 (9th Cir. 2006)*.  See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence).  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).  The RFC need not mirror

a particular opinion; it is an assessment formulated by the ALJ based on all relevant evidence.  *See*

20 C.F.R. §§ 404.1545(a)(3).

For applications filed on or after March 27, 2017, the new regulations eliminate a hierarchy

of medical opinions, and provide that "[w]e will not defer or give any specific evidentiary weight,

including controlling weight, to any medical opinion(s) or prior administrative medical finding(s),

including those from your medical sources."  20 C.F.R. § 404.1520c(a).  Rather, when evaluating

any medical opinion, the regulations provide that the ALJ will consider the factors of supportability,

consistency, treatment relationship, specialization, and other factors.  20 C.F.R. § 404.1520c(c).

Supportability and consistency are the two most important factors and the agency will articulate

how the factors of supportability and consistency are considered.  *Id.*

Recently, the Ninth Circuit addressed whether the specific and legitimate reasoning

standard is consistent with the revised regulations, concluding:

> The revised social security regulations are clearly irreconcilable with our caselaw
> according special deference to the opinions of treating and examining physicians on
> account of their relationship with the claimant. … Our requirement that ALJs
> provide "specific and legitimate reasons" for rejecting a treating or examining
> doctor's opinion, which stems from the special weight given to such opinions, see
> Murray, 722 F.2d at 501–02, is likewise incompatible with the revised regulations.
> Insisting that ALJs provide a more robust explanation when discrediting evidence
> from certain sources necessarily favors the evidence from those sources—contrary
> to the revised regulations.

*Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022)

## 2.   **Analysis**

Plaintiff reincorporates by reference her argument discussed above, contending that the

same reasoning supporting the severity of her foot impairments supports the standing and walking

restrictions identified by Drs. Sharma and Abordo.  The Court disagrees.  As noted above, the

evidence in support of her foot limitations was limited.  Countervailing evidence identified by the

ALJ at step four included normal balance and gait (B16F/36, 57); daily dog walks; (B4F/65,

B24F/46); equal muscle strength bilaterally, no tenderness, and no antalgic gait (B16F/53); and her

reported significant benefit from orthotics (B9F).  AR 25–26.  At step two the ALJ also noted that

Plaintiff took her nieces to the mall, and had at least a one month period of diabetes medication

1    non-compliance.

2           While this evidence did not refute the existence of a severe impairment at step two, nor did

3    it support the notion that she could stand and walk without limitation, this evidence tends to

4    undermine any suggestion that she has a less than sedentary exertional capacity with a standing and

5    walking tolerance of less than 2 hours per day.  The consultative internal medicine examiners, Drs.

6    Wagner and Tang, also undermined those opinions by opining Plaintiff could perform medium

7    work without specifying any standing and walking limitations.  AR 633-38.  The undersigned

8    considers these opposing views to be exaggerated and not supported by the evidence.

9           Consistent with his specialization, Dr. Abordo (a DPM, or doctor of podiatric medicine)

10   only completed the sections of the RFC form relating to Plaintiff's foot impairments, and struck

11   out the remaining sections.  AR 1051-1055.  Dr. Sharma, Plaintiff's treating physician, identified

12   an additional impairment, namely right shoulder pain, tendinosis, rotator cuff and bursal tear status

13   laparoscopic repair.  AR 758, 760.  Plaintiff specifically underscores the portion of Dr. Sharma's

14   opinion that Plaintiff was limited to lifting/carrying 10 pounds occasionally and less than 10 pounds

15   frequently, and the portion identifying limitations with respect to reaching in all directions and

16   handling/fingering.   Br. at 32 (citing AR 760).  Plaintiff contends these limitations are well

17   supported by the treating evidence of record, including:

18            . . . examination findings of left shoulder tenderness with moderate pain with
19        motion; right shoulder tenderness with mild pain with motion; positive bilateral
          anterior apprehension, Hawkin's, and Neer's tests (AR 407, 447, 603); "moderate
20        pain" with motion on the right shoulder (AR 456); tenderness to the right lower
          paracervical, upper trapezius, and periscapular; decreased range of motion and
21        tenderness to T2, T5-T6, right C5, and left C3; restricted right shoulder range of
          motion in flexion, abduction, and adduction with restricted internal rotation with
22        increased right upper arm pain; positive impingement test (AR 461, 603); decreased
          range of motion and tenderness to T4, T5, right C5, and left C2-C3; limited right
23        shoulder range of motion with increased upper arm pain (AR 473); "grossly limited"
          right shoulder range of motion with pain; weakness with forward flexion, abduction,
24        external rotation, and internal rotation (AR 603); increased thoracic kyphosis at the
          upper thoracic spine at the C-T junction; mild protraction evident at the shoulders,
25        right worse than left with mild elevation; right shoulder active range of motion
          decreased in flexion to 75 degrees and abduction to 60 degrees; inability to perform
26        functional external rotation reach and functional internal rotation reach; limited right
          shoulder muscle strength in flexion and abduction 3-/5; limited internal rotation and
27        external rotation 2+/5; Speed's test was mildly positive with increased tension to
28

LHB; and tenderness upon palpation of the supraspinatus tendon, sub-acromial space and the long head of biceps tendon (AR 562, 577); a grossly limited range of motion with the pain of the right shoulder; limited active abduction; positive right shoulder impingement sign and Neer's impingement sign (AR 588); decreased active right shoulder range of motion in flexion 115 degrees, abduction to 100 degrees, functional external rotation reach to C3, and functional internal rotation reaches to PSIS; decreased right shoulder strength in flexion 3+/5, shoulder abduction 3+/5, shoulder internal and external rotation 3/5; and tenderness present upon palpation of the supraspinatus tendon, subacromial space, and the long head of biceps tendon (AR 653); decreased active range of motion of the right shoulder in flexion to 90 degrees and abduction to 75 degrees, limited functional external rotation reach to ear, and limited functional internal rotation reach to PSIS; decreased right shoulder strength in flexion 3-/5 and abduction 3-/5; and tenderness upon palpation of the supraspinatus tendon, subacromial space, and the long head of biceps tendon (AR 879); swelling to the left middle finger (AR 1113); and locking of left and right fingers.

Dr. Sharma's limitations were further supported by objective imaging findings consisting of a July 10, 2017 MRI of the right shoulder documented findings of tendinosis and high-grade partial-thickness bursal-sided tearing at the anterior footplate insertion of the distal supraspinatus tendon; and tendinosis and low-grade partial-thickness undersurface tearing of the distal infraspinatus tendon (AR 536, 603); January 28, 2020 x-ray of the bilateral hands documenting moderate osteoarthritic type degenerative changes, mainly in the distal interphalangeal and proximal interphalangeal joints of the fingers and interphalangeal joint of the thumb (AR 1184), with consistent reports of "constant," "worsening," "sharp" right shoulder pain aggravated by lifting, movement, and pushing (AR 445) that interferes with sleep (AR 404, 561); restricted and painful ROM of the right shoulder (AR 471, 602), such that she had decreased ability to wash her back and was unable to perform ADLs, including household chores, after a total of 45 physical therapy sessions. (AR 652). Ultimately, Ms. Hernandez underwent a right shoulder arthroscopically-assisted SLAP repair, arthroscopically-assisted chondroplasty of the glenohumeral joint with mini-open acromioplasty, mini-open subacromial decompression, and mini-open rotator cuff repair with graft and manipulation of the right shoulder for diagnosis of right shoulder labral tear, right shoulder chondromalacia, right shoulder impingement, and right shoulder rotator cuff tear with arthrofibrosis. (AR 396-397).  Br. at 32–34.

Notwithstanding the extensive pre-surgical shoulder deficits noted on imaging and physical examination (which Plaintiff diligently covered in great detail), Plaintiff did ultimately undergo laparoscopic surgery on November 29, 2017, ostensibly with a view toward improving her condition thereafter.  AR 396–97.  And, importantly, the relevant period for Plaintiff's claim began one month later when she applied for SSI benefits on December 27, 2017.  Consistent with both of those facts, the ALJ relied mostly on the records documenting Plaintiff's condition following her

surgery:

> With regard to right shoulder repair, the record shows that the claimant had surgery in November 2017 (B3F/10-12). The record contains documentation of physical therapy after the surgery (B5F generally). The therapy notes indicate that she was progressing well and had increased functional strength for overhead reach (B5F/9). At follow up appointments, the claimant rated her pain as a "1.0" on a 10-point scale at times (B7F/1). Additionally, although she complained of soreness, weakness and stiffness, her symptoms improved with treatment and medication (*Id*.). She demonstrated limited range of motion and positive impingement signs at times (B7F/2, B9F/3). However, she also exhibited five out of five strength in the right upper extremity (B7F/2, B9F/6).

> AR 22.

These findings reasonably support the ALJ's rejection of Dr. Sharma's opinion that Plaintiff could lift no more than 10 pounds occasionally and less than 10 pounds frequently. Plaintiff ignores this discussion, focusing exclusively on the one paragraph the ALJ provided in which she explained why she rejected Dr. Sharma's opinion. Equally important is the ALJ's affirmative reasoning in support of the RFC, reasoning equally applicable to the rejection of Dr. Sharma's contrary opinion. *See Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989) ("As a reviewing court, we are not deprived of our faculties for drawing specific and legitimate inferences from the ALJ's opinion . . . if those inferences are to be drawn."). Indeed, the ALJ underscored Plaintiff's increased functional strength for overhead reach, a fact uniquely relevant to one of the primary issues at bar, namely Plaintiff's overhead reaching capacity.

Although Dr. Sharma's identified lifting and carrying limitations (maximum 10 pounds) were not supportable, it does not follow that the ALJ's RFC assessment for medium exertional work (lifting 25 pounds frequently and 50 pounds occasionally) was supported by substantial evidence. *See* SSR 83-10 (explaining the lifting requirements for medium work). The evidence on point largely was limited to the pre- and post-surgical evidence discussed above and the opinion of Dr. Wagner and Dr. Tang, the consultative examiners, who opined Plaintiff could perform medium work. Plaintiff's formulation of her third claim of error, and Defendant's response thereto, miss the mark insofar as they incorrectly suggest the existence of a binary, namely that the ALJ's only options were to choose between conflicting opinions. Plaintiff favors Dr. Sharma's view while

defendant favors the consultative examiners' views.[10]  An RFC determination is not simply a battle of competing opinions.  The RFC need not mirror any particular opinion; it is an assessment formulated by the ALJ based on all relevant evidence.  *See* 20 C.F.R. §§ 404.1545(a)(3).

Here the opinions in question were diametrically opposed and a balanced view of the record supports neither opinion.  On the one hand, the records cited by the ALJ above suggest Plaintiff progressed reasonably well with physical therapy following her surgery, which significantly undermines Dr. Sharma's opinion that she can lift no more than 10 pounds occasionally, and less than 10 frequently.  On the other hand, the non-specific post-surgical references to "improvement" from baseline should be viewed in the context of what that baseline was prior to surgery, namely a significantly impaired shoulder characterized by extensively documented clinical deficits in strength and range, as quoted above and summarized by Plaintiff in detail.  Surgery is not necessarily a panacea.  Despite periodic reports of pain levels as low as 1 out of 10 after surgery, the ALJ acknowledged the records reflect some remaining deficiencies including positive impingement signs.  Plaintiff's other impairments must be taken into consideration as well.  In short, it is simply not reasonable to suggest that a 58-year old obese individual with a surgically repaired shoulder of the dominant upper extremity, bilateral hand osteoarthritis, and diabetic neuropathy in both upper extremities can occasionally lift up to 50 pounds in a work setting.  The ALJ's finding that Plaintiff can perform medium exertional lifting and carrying is not supported by substantial evidence

The ALJ also rejected Dr. Sharma's opinion concerning reaching, manipulations, pulmonary irritant exposure, and sitting.  The reasoning was valid:

> The undersigned finds the opinion unpersuasive. *Dr. Sharma does not provide* *specific limitations concerning reaching, handling and fingering nor are handling*

---

[10] The parties also collectively offered about 10 pages of discussion as to whether, following the March 2017 regulatory changes, there is any continued viability of the "treating physician rule," associated deference to treating physician's opinions, or associated requirements that the ALJ identify "specific and legitimate" reasoning for rejecting a contradicted treating physician's opinion, or "clear and convincing" for rejecting an uncontradicted treating physician's opinion.  Setting aside the practical effect of these tenants here, the Ninth Circuit answered the question in the negative in *Woods* earlier this year, as quoted above.  *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

*and fingering limitations supported by the notes regarding shoulder surgery.* Furthermore, avoiding all pulmonary irritants due to allergies is not reasonable, especially given that the record does not indicate an ongoing issue with allergy-related problems. Moreover, Dr. Sharma did not provide support for limitations on the claimant's ability to sit during the workday.

AR 25 (emphasis added).

In short, Plaintiff's contention that the ALJ wrongfully rejected Dr. Sharma's opinion that she was limited to "never" reaching in all directions is predicated on a misreading of his opinion. Br. at 32. Dr. Sharma did not so opine. The form identified two alternative check boxes for the following four capacities: reaching in all directions, handling, fingering, and feeling. AR 760. The alternative check boxes were "limited" and "unlimited." *Id.* Dr. Sharma checked the box corresponding to "limited" for the first three capacities. The form then provides space for the physician to "Describe how the activities checked 'limited' are impaired. Also, explain how and why the evidence supports your conclusions in items 1 through 4. Cite the specific facts upon which your conclusion is based." *Id.* Dr. Sharma simply wrote Plaintiff's diagnoses again: "right shoulder pain s/p laparoscopic surgery, tendinosis, and tear." *Id.* Dr. Sharma did not specify the extent of the reaching, handling, and fingering limitations (never, occasional, frequent, etc.).

"The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Thomas v. Barnhart*, 278 F.3d 948, 957 (9th Cir. 2002) (citation omitted). That proposition applies with greater force here given that Dr. Sharma did not fully articulate his conclusion in the first instance (as to how frequently, in his view, Plaintiff could perform reaching, handling, fingering, and feeling). And, as the ALJ alluded to, non-specific pain status post-surgery is not  akin to a diagnostic or clinical finding that would support limitations. A diagnostic or clinical finding might include, for example, abnormalities on imaging, tenderness to palpation, positive impingement sign, decreased range of motion, or decreased strength.

Moreover, the ALJ did not wholly reject the notion that Plaintiff had reaching or manipulative limitations. To the contrary, the RFC as formulated by the ALJ reflects that Plaintiff is restricted to no more than occasional overhead reaching with the right upper extremity, and no more than frequent handling and fingering bilaterally. AR 22. Plaintiff fails to establish that the

post-surgical evidence requires greater restrictions in those respects.  And, given that Dr. Sharma neglected to specify the frequency with which he believed Plaintiff could perform those activities, it cannot be said that the ALJ necessarily rejected Dr. Sharma's opinion in those respects.  The ALJ also rejected Dr. Sharma's opinion with respect to pulmonary irritant exposure and sitting, and Plaintiff does not challenge the ALJ's conclusions in those respects.

Toward the end of her third claim of error, at page 37 of her 42-page opening brief, Plaintiff returns to her discussion regarding her standing and walking limitations and contends that the ALJ should have credited the opinion of Dr. Abordo that she can stand and walk less than two hours a day in consideration of diabetic neuropathy and plantar fasciitis.  Br. at 37.  Specifically, Plaintiff contends that "although 'Exhibit B16F/53,' cited by the ALJ documents 'no antalgic gait' and 'equal muscle strength' in his 'extremities,' the ALJ fails to mention that this treatment note also documents 'diminished sensations on the right side of the toes to the arch,' 'severe; thickening of the toe nails and skin (AR 935), objective findings which would account for Dr. Abordo's limitations on standing and walking." *Id.*  The ALJ cited another instance of "diminished sensation on the right foot from the toes to the arch" at step two, and covered the pertinent evidence concerning plantar fasciitis, including progressive calcaneal spurs, flattening of the plantar arch, and degrative changes.  AR 18–19.  As discussed above, the Court agrees that the ALJ erred in finding Plaintiff's foot impairments non-severe and finding she could stand and walk without limitation.  It does not follow however that the ALJ must adopt Dr. Abordo's opinion that Plaintiff could stand and walk less than two hours per day.  Neither diminished sensation nor toe nail/skin thickening establish or strongly suggest Plaintiff can stand and walk less than two hours in a workday.

The physical RFC was not supported by substantial evidence insofar as it requires medium exertional lifting/carrying and omits limitations as to standing and walking.  The ALJ committed no other errors with respect to Plaintiff's physical RFC and committed no errors with respect to Drs. Sharma and Abordo's opinions.

**D.**     **Dr. Mouanoutoua's Opinion and the Mental Component of the RFC**

On December 4, 2018, Plaintiff's treating psychologist, Dr. Mouanoutoua, completed a mental residual functional capacity (MRFC) questionnaire and opined that Plaintiff was moderately to markedly limited in 18 out of 20 areas of mental functioning due to "ongoing chronic depression that impair(s) her interest in daily chores, her distress tolerance level, and her ability to focus on tasks, especially complex ones."  AR 1065–67.

The ALJ rejected the opinion, explaining as follows:

> The undersigned finds this opinion unpersuasive. Dr. Mouanoutoua supported the opinion with subjective complaints from the claimant (see B16 generally). Furthermore, the opinion is not consistent with objective evidence from other sources. For example, Dr. Mouanoutoua opined that the claimant has marked limitations in adaption (B22F/2). However, the record shows that she generally appeared well developed, well nourished, alert and oriented to time, place, person and situation as well as exhibited appropriate mood and affect, normal insight and normal judgement (B4F/5, 10, 14, 38). She also travels to visit her grandchild and takes public transportation indicating that she is able to adapt to changed environments (B5E, B1F/6, B4F/41).

AR 27.  Plaintiff takes issue with the explanation for several reasons.[11]  First, the ALJ cited Dr. Sharma's physical examinations to illustrate that Plaintiff "generally appeared" well developed, nourished, alter and oriented times 3, with appropriate mood, affect, insight and judgment.  Dr. Sharma was the primary care physician and, as such, his psychiatric examination was not a comprehensive Mental Status Examination (MSE), but an abridged version thereof among other components of the exam which include a general exam, constitutional, shoulder, other musculoskeletal, and finally, psychiatric.  *See, e.g.*, AR 407.  Where, as here, the record contains comprehensive mental status examinations conducted by psychiatric professionals in the context of an exam specifically for psychiatric care (and not primary care), the focus should be on those exams (and, as explained below, the ALJ did cite those exams at other portions of her opinion).  *See, e.g.*, AR 419-20 (documenting Dr. Mouanoutoua's MSE, noting normal appearance, normal build, tense posture, average eye contact, slowed activity, cooperative attitude, depressed and irritable mood,

---

[11] Plaintiff again applies the "specific and legitimate reasoning" standard which, as noted above, has no continued applicability following the March 2017 regulation revisions, as determined by the Ninth Circuit earlier this year in *Woods*.

constricted affect, clear speech, logical thought process, perception within normal limits, denies hallucinations, denies delusions, average intelligence, partial insight, impaired judgment, but omitting findings as to attention and concentration and short-term memory).

Second, Plaintiff disputes that ALJ's critique that Dr. Mouanoutoua supported the opinion with subjective complaints from the claimant.  Plaintiff cites caselaw noting that such is simply the nature of psychiatric care, namely that it is does not lend itself to as much objectivity as other fields of care.  *See, e.g.*, *Buck v. Berryhill,* 869 F.3d 1040, 1049 (9th Cir. 2017).  Indeed, this was not a persuasive reason.  The ALJ's citation to exhibit B16 generally is vague.  Ostensibly the ALJ was referencing B16*F* which contains progress notes from Dr. Mouanoutoua, but even that exhibit contains other records intermixed and is over 100 pages in length.  Moreover, what the ALJ is likely referencing are simply therapy progress notes which are often from the patient's perspective.  A MSE, by contrast, contains objective findings based on the provider's observations.  It is common for a provider to conduct a comprehensive MSE at an initial visit and at periodic junctures thereafter, and not to repeat it at every visit.

Finally, Plaintiff contends the ALJ mischaracterized the hearing testimony in finding that Plaintiff "travels to visit her grandchild and takes public transportation indicating that she is able to adapt to changed environments," whereas her testimony clarified that her grandchildren visit her, and she does not take public transportation in the sense that she navigates a public bus system, but rather uses a medical transportation service.  The point is not well taken as the ALJ did not cite the hearing testimony in support of that finding, but rather cited the disability report from the field office, and two progress notes.  AR 27 (citing B5E, B1F/6, B4F/41).  If Plaintiff's contention is that her testimony offered more color and clarifying contextual information about what those records otherwise suggest, that is a distinct contention.

Albeit, the short paragraph the ALJ directed specifically at Dr. Mouanoutoua's opinion was not persuasive.  Nevertheless, this was the penultimate paragraph in a six-page, single-spaced RFC analysis that contained ample additional reasoning.  Thus, the ALJ provided additional reasoning in affirmatively explaining what the mental health evidence showed on balance, the justification for the mental RFC, and in explaining the persuasiveness of the consultative examining psychiatric

opinions rendered by Drs. Swanson and Stafford, both of whom offered opinions that the ALJ

incorporated into the RFC.  That discussion, quoted below, was equally applicable to the ALJ's

rejection of Dr. Mouanoutoua's contrary opinion.  *See Magallanes v. Bowen*, 881 F.2d 747, 755

(9th Cir. 1989) ("As a reviewing court, we are not deprived of our faculties for drawing specific

and legitimate inferences from the ALJ's opinion . . . if those inferences are to be drawn.").

> At the consultative examination, the claimant's scores on the Wechsler Adult Intelligence Scale–Fourth Edition indicates that she has a full-scale intelligence quotient of 77, which places her in the borderline intellectual functioning range of intelligence (B6F/6). Additionally, the record shows that she reported having anxiety and depression (B16F/56). With regard to anxiety, the claimant stated that she has had symptoms off and on for 15 years that included excessive worrying, restless feeling, poor sleep and poor concentration (B16F/69). Although she exhibited depressed mood at times (B4F/18, 27) and had Global Assessment of Functioning scores of 55 and 65 during the period at issue (B6F/7, B16F/85, 109), the record shows that she generally appeared well developed, well nourished, alert and oriented to time, place, person and situation as well as exhibited appropriate mood and affect, normal insight and normal judgement (B4F/5, 10, 14, 38). Moreover, the record shows that she took vacations to visit her grandchildren and was able to take trains (B1F/6). She also took a trip to Utah to visit family (B4F/41). Furthermore, the record indicates that the claimant learned to recognize her depression, to use journal entries to cope with depressive thoughts and to use distraction techniques to reduce feelings of depression (B4F/17). She also reported using prayer and meditation (Id.). She generally denied feelings of guilt and hallucinations, as well as suicidal and homicidal ideations (B1F/6, B4F/22, 75, 91, 105, B16F/107). The record describes her as "pleasant" and "cooperative" (B3F/3, 7, B4F/17). The undersigned notes that the record shows that the claimant went months without mental health therapy. Specifically, the claimant scheduled an appointment with mental health providers after she received a letter informing her that she was discharged due to lack of activity (B1F/5, 6). At that scheduled appointment in July 2017, she appeared stable, happy and reported that she had been in therapy since March 2017 (Id.).
>
> . . .
>
> With regard to her mental residual functional capacity, the undersigned finds that she can perform work that needs little or no judgment to do simple duties that can be learned on the job in a short period of time of up to 30 days and has a reasoning level of no higher than two due to her borderline intellectual functioning and subjective complaints of memory loss despite the record showing intact short-term, recent and remote memory (B6F/5, B7F/1). Although the record indicates that the claimant had "full" concentration at times (e.g. B16F/58), the undersigned finds that the claimant can sustain ordinary routines, understand, carry out and remember simple instructions and use judgment in making simple work related decisions as

well as attend and concentrate for two hour periods totaling a normal eight hour workday with usual work breaks. Furthermore, because she was described as "pleasant" and "cooperative" (B3F/3, 7, B4F/17) and reported spending time with others without difficulty, she can respond appropriately to supervision, co-workers and usual work situations, and tolerate occasional interaction with the general public. The undersigned finds the claimant can deal with changes in a routine work setting because she generally appeared well developed, alert and oriented to time, place, person and situation as well as exhibited appropriate mood and affect, normal insight and normal judgement (B4F/5, 10, 14, 38).

. . .

Consultative examiner S. Swanson, Ph.D. opined in March 2018 the claimant is able to maintain concentration and relate appropriately to others in a job setting, handle funds in her own best interests, understand, carry out, and remember simple instructions, respond appropriately to usual work situations, such as attendance, safety, and handle changes in routine, and maintaining social relationships (B6F). The undersigned finds the opinion persuasive. The opinion was supported by examination findings. Moreover, the opinion is generally consistent with the objective evidence from other sources. For example, the claimant was described as "pleasant" and "cooperative" (B3F/3, 7, B4F/17). Furthermore, although the claimant alleged memory loss, the record shows intact short-term, recent and remote memory (B6F/5, B7F/1), which indicates that the claimant is able to understand, remember and carry out simple instructions.

Consultative examiner M. Stafford, Psy.D. opined in October 2019 that the claimant's ability to perform simple and repetitive tasks is unimpaired, ability to perform detailed and complex tasks is moderately impaired due to lack of motivation and low frustration tolerance, ability to accept instructions from supervisors is moderately impaired due to a low frustration tolerance and circumstantial thought process, ability to interact with co-workers, supervisors, and the public is moderately impaired due to emotional dysregulation, low frustration tolerance, and circumstantial thought process, ability to perform work activities on a consistent basis without special or additional instructions is unimpaired and ability to maintain regular attendance in the workplace is mildly impaired (B19F). Dr. Stafford further opined that the claimant's ability to complete a normal workday without interruptions from a psychiatric condition is moderately impaired due to emotional dysregulation, deficits in sustained attention, low frustration tolerance, and low motivation and her ability to deal with the usual stress encountered in the workplace is moderately impaired due to emotional dysregulation, low frustration tolerance, and limited coping skills (B19F/7). The undersigned finds Dr. Stafford's opinion persuasive, as the opinion was supported by examination findings. Additionally, the opinion is generally consistent with the objective evidence from other sources as stated above regarding Dr. Swanson's opinion.

AR 23-24, 26-27.

In contrast to the short paragraph directed specifically at Dr. Mouanoutoua's opinion, the more extensive discussion throughout the RFC analysis cited MSE findings by treating providers and the consultative examiners, which showed a mix of normal and abnormal findings alike. The fact that Plaintiff underscored many additional countervailing abnormal MSE findings does not mean the ALJ's mental RFC was unsupported. This is not a case where the ALJ refused to acknowledge mental health abnormalities or deficiencies. To the contrary, the ALJ found Plaintiff had the severe mental impairments of borderline intellectual functioning, generalized anxiety disorder, and major depressive disorder. The ALJ included extensive corresponding mental RFC restrictions in consideration of the abnormal findings in the record, including little or no exercise of judgment, simple duties that can be learned on the job in a short period of time of up to 30 days, and a reasoning level of no higher than two, ordinary routines, understand and carry out simple instructions, use judgment in making simple work related decisions, attend and concentrate for two hour periods with usual work breaks, and occasionally interact with the general public. AR 21.

It is not sufficient for Plaintiff to establish that her view of the record (or Dr. Mouanoutoua's view of the record) is supportable. Rather, she must establish that the ALJ's view of the record is unsupportable, and that Plaintiff's view must control. If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).

Plaintiff fails to establish as much by critiquing the lone paragraph the ALJ directed at Dr. Mouanoutoua's opinion, and importantly, failing to address the additional applicable reasoning throughout the ALJ's opinion including: a mix of normal and abnormal MSE findings noted by treating providers (e.g. Ex.B16F/58, AR 939), her treatment notes reflecting she learned to cope with depression using journaling, distraction techniques, prayer, and meditation (though depression still lingered and impaired ADLs (Ex. B14/F17, AR 419)), Plaintiff's presentation at the two consultative examinations, her reports of taking trips to visit family including a trip to Utah, and gaps in her mental health treatment. These records cited by the ALJ do not refute the existence of mental health impairments and associated limitations, nor did the ALJ conclude that they did. Plaintiff fails to establish that additional restrictions were warranted in the RFC. The ALJ

committed no error with respect to Dr. Mouanoutoua's opinion.

## VI.   Conclusion and Remand for Further Proceedings

The ALJ erred in finding Plaintiff's diabetic neuropathy and plantar fasciitis with heel spurs to be non-severe, in omitting standing and walking limitations from the RFC, and in concluding Plaintiff could perform medium exertional lifting and carrying (25 pounds frequently and 50 pounds occasionally).  Remand is appropriate for the ALJ to conduct additional proceedings as necessary and reach a reasoned conclusion, supported by substantial evidence, as to what extent Plaintiff can stand, walk, lift and carry.  *See Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("Generally when a court . . . reverses an administrative determination, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

## VII.   Order

For the reasons stated above, the Court finds that substantial evidence and applicable law do not support the ALJ's conclusion that Plaintiff was not disabled.  Accordingly, Plaintiff's appeal from the administrative decision of the Commissioner of Social Security is granted.  The Clerk of Court is directed to enter judgment in favor Plaintiff Maria Teresa Hernandez, and against Defendant Kilolo Kijakazi, acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **November 10, 2022**

_____
UNITED STATES MAGISTRATE JUDGE